UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE SOCIETY OF LLOYD'S,

Plaintiff

v.                                              C–1–04–188

JUDITH PRICE SHELL, *et al.*,

Defendants

## ORDER

This matter is before the Court upon the Report and Recommendation of the United States Magistrate Judge (doc. no. 52), plaintiff's objections (doc.  no. 53), defendant Shell's objections (doc. no. 54), plaintiff's response (doc. no. 55) and defendant Shell's response (doc. no. 56).  The Magistrate Judge concluded that  1) Lloyd's should be required to apply and obtain the permission of the English court through existing procedures of English law before this Court can find that the English judgment is "enforceable where rendered;" and 2) requiring actual notice to a defendant when a foreign judgment is at issue would be contrary to the purposes underlying the Ohio Recognition Act.  The Magistrate Judge therefore recommended that plaintiff Lloyd's Motion for Summary Judgment against Shell (doc. no. 20) be denied and defendant Shell's cross–Motion for Summary Judgment (doc. no. 37) be granted.

2

The parties object to the Judge's Report and Recommendation on the grounds that his findings are contrary to law.

## REPORT AND RECOMMENDATION

Plaintiff The Society of Lloyd's (Lloyd's) obtained a default judgment in England against defendant Judith Price Shell (Shell), a Cincinnati, Ohio resident, for premiums she owed in connection with underwriting obligations.  Lloyd's filed this diversity action seeking recognition and enforcement of the English judgment. This matter is before the Court on Lloyd's motion for summary judgment against Shell (Doc. 20), Lloyd's notice of supplemental authority (Doc. 23), Shell's cross-motion for summary judgment and exhibits in support thereof (Docs. 37, 38), Shell's response to Lloyd's motion for summary judgment (Doc. 39), Lloyd's response to Shell's cross-motion for summary judgment (Doc. 44), Lloyd's reply memorandum in support of its motion for summary judgment (Doc. 45), Shell's reply memorandum in support of her cross-motion for summary judgment (Doc. 49), Lloyd's notice of supplemental English authority (Doc. 50), and Shell's response to Lloyd's notice of supplemental English authority. (Doc. 51).  The Court determines that resolution of the above motions does not require oral argument. S.D. Ohio Civ. R. 7.1(b)(2).

3

## I.  FACTS

Lloyd's, through a succession of Parliamentary Acts, is authorized to regulate an English insurance market located in London, England.  The background as to the nature and structure of Lloyd's of London was set forth in *Shell v. Sturge*, 55 F.3d 1227 (6th Cir. 1995):

> The Society of Lloyd's, or Lloyd's of London ("Lloyd's"), is not an insurance company, but rather is an insurance marketplace in which individual Underwriting Members, or Names, join together in syndicates to underwrite a particular type of business. The Corporation of Lloyd's . . . regulates the Lloyd's insurance market. The Corporation itself does not underwrite any insurance, but provides facilities and services to assist underwriters. . . .
>
> *
> *
> *
>
> A Name cannot conduct insurance business directly, but instead enters into an Agency Agreement with a Members' Agent who acts on the Name's behalf. Names typically belong to several syndicates in order to spread their risks and the Members' Agents assist the Names in selecting the syndicates to join. Each Name is responsible for his or her proportionate share of a syndicate's losses up to his or her entire net worth.

55 F.3d at 1228.  Mrs. Shell is a Name and entered into a General Undertaking by which she agreed, *inter alia*, that any dispute with Lloyd's related to Mrs. Shell's participation in the Lloyd's market would be governed by English law and would be exclusively within the cognizance of the English courts. (Doc. 11, Demery Statement, ¶ 5; Exhibit 1)[1]. Mr. Shell, a successful real estate executive, also was

---

[1]     Statement of Nicholas P. Demery, a solicitor in the employ of Lloyd's.

a Name. (Doc. 6, Shell Declaration, ¶¶ 2, 14–15)[2].  Mrs. Shell became involved in the Lloyd's market on the recommendation of Mr. Shell, whose office address was used for correspondence between either of them and Lloyd's. (Doc. 6, Shell Declaration, ¶¶ 14–15).  Mr. Shell became ill in 1997 and did not recover.  Prior to his death, Mr. Shell did not inform Mrs. Shell of any then–recent communications from or regarding Lloyd's.  (Doc. 6, Shell Declaration, ¶ 16).

In the late 1980s and early 1990s, the Names suffered large underwriting losses.  (Doc. 11, Demery Statement, ¶ 7). Names could not secure affordable reinsurance and began to default on their obligations in the Lloyd's market. (Doc. 11, Demery Statement, ¶¶ 6–7).  This imperilled the rights of policyholders to be paid for valid claims and threatened the viability of Lloyd's market.  To address this situation, Lloyd's devised the Reconstruction and Renewal Plan (the "R&R Plan") whereby Lloyd's reinsured all of the Names' outstanding obligations through a reinsurance contract with the Equitas company.  Lloyd's calculated and charged each Name the cost of reinsurance, which the parties refer to as the "Equitas Premium." (Doc. 11, Demery Statement, ¶8).  In addition, the R&R Plan provided each Name a Settlement Offer whereby the Name could satisfy its Equitas Premium at a discount. *Id.*  About 95% of Names accepted their respective Settlement Offers, but Mrs. Shell was not among them.  Each Name who did not accept the Settlement Offer was bound to pay the respective full Equitas Premium. (Doc. 11, Demery

---

[2]        Declaration of Judith P. Shell.

5

Statement, ¶9).  Pursuant to the previously enacted Substitute Agents Bylaw and R&R Plan, Lloyd's appointed Substitute Agents on behalf of the Names. (Doc. 11, Demery Statement, ¶10).  In September 1996, Additional Underwriting Agencies (No. 9) Limited ("AUA9") was appointed as the Substitute Agent on behalf of the Names, including Mrs. Shell.  *Id.*  AUA9 was supplied the authority to enter into, and in fact executed, the Reinsurance and Run−Off Contract (Reinsurance Contract) with Equitas on behalf of the Names. *Id.*  The Reinsurance Contract contains a provision that "[e]ach Name . . . not domiciled in the United Kingdom hereby irrevocably appoints the Substitute Agent as agent to accept service of any proceedings in the English Courts on his behalf." (Doc. 11, Demery Statement, ¶10, Exh. 4).  The R&R Plan also assigned to Lloyd's the right to collect Equitas Premiums from those Names who did not pay (the "Non−Payers"). (Doc. 11, Demery Statement, ¶¶ 7−11, Exhs. 2, 4).

Lloyd's set about to recover from the Non−Payers, including Mrs. Shell, by sending them correspondence and then, if necessary, filing suits in the English Court.  The majority of the Non−Payers appeared through counsel and defended such suits, and the English Court selected three "test cases" for consideration of the defendant Names' arguments against Lloyd's. Those arguments—divided into "fraud" and "nonfraud" contentions for case management purposes— were heard and decided adversely to the Names by the English Court in decisions issued, respectively, during February and April 1997. (Doc. 11, Demery Statement, ¶¶ 14−

6

15; Exhibits 7, 8). Those decisions were upheld by the Court of Appeal in London, and the House of Lords declined the Names' request for additional appeal. (Doc. 11, Demery Statement, ¶¶ 16–17; Exhibit 2).

Claiming breach of contract for failure to pay the Equitas Premium, Lloyd's commenced action against Mrs. Shell in the High Court of Justice, Queen's Bench Division (the "English Court") on June 4, 1997, seeking the Equitas Premium and interest thereon.  The Writ of Summons in the English Action was served on Mrs. Shell through the Substitute Agent AUA9 pursuant to ¶25 of the Reinsurance Contract which authorized AUA9 to accept service on Mrs. Shell's behalf. (Doc. 11, Demery Statement, ¶ 12; Exhibit 5). Mrs. Shell—who has stated that she was not at the time made personally aware of the English Action—did not appear or defend, and the Final Judgment was entered against her for £418,777.03 (the "Initial Judgment Amount," consisting of £395,361.34 principal and £23,415.69 in interest through June 27, 1997, the "Judgment Date"), with interest from the Judgment Date at the rate of 8% per annum. (Doc. 11, Demery Statement, ¶ 13). The Final Judgment remains unpaid.  Since the Judgment Date, however, Mrs. Shell has had the benefit of several credits against the Initial Judgment Amount, such that, as of August 1, 2004, the amount due, inclusive of accrued interest and net of the credits, was £616,794.02, and the daily accretion of interest on the Final Judgment thereafter is £86.20. (Doc. 20, Demery Supplemental Statement, ¶¶ 4–5).

The Demery Statement states:

> The Final Judgement is conclusive and enforceable against Mrs. Shell. If Mrs. Shell did not learn of the English Action until after the Final Judgment was issued, English law would permit Mrs. Shell to make application to the English Court to set the Final Judgment aside. In such event, the English Court would exercise its discretion to decide whether to set the Final Judgment aside and allow Mrs. Shell to defend the claim of Lloyd's. Mrs. Shell, who has the benefit of English counsel acting on her behalf, has not applied to the English Court to set the Final Judgment aside.

(Doc. 11, Demery Statement, ¶19). Lloyd's filed action in this Court on March 8, 2004 seeking recognition of the English default judgment against Mrs. Shell. (Doc. 1). This matter is now ripe for resolution on the pending motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Under Rule 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action.

*Celotex Corp.*, 477 U.S. at 323.  The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at 249-50.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. APPLICABLE SUBSTANTIVE LAW

A federal court, sitting in diversity, must apply the law of the state in which it sits in resolving questions of substantive law. *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938). Lloyd's contends that under the substantive principles of international comity embodied in the Uniform Foreign Money-Judgments Recognition Act (the Recognition Act), as adopted in Ohio and codified as Ohio Rev. Code §§ 2329.90-2329.94, Lloyd's is entitled to judgment in this Court recognizing the Final Judgment against Mrs. Shell as a matter of law.  Section 2329.91(A) provides in relevant part:

> [A]ny foreign country judgment that is final, conclusive, and enforceable where rendered shall be recognized and enforced by the courts of this state, even though an appeal from the judgment is pending or the judgment is subject to an appeal. Such a foreign country judgment is enforceable in this state in the same manner as a judgment of another state that is entitled to full faith and credit.

Ohio Rev. Code § 2329.91(A).

9

Mrs. Shell argues, without citation to authority, that the Ohio Recognition Act is inapplicable to this action because it was brought through a complaint filed in federal court and not in an Ohio common pleas court through the filing procedures for recognition of sister state judgments entitled to full faith and credit. (Doc. 37 at 3-4)[3]. In this same vein, Mrs. Shell also argues that the Ohio common law of comity governs recognition (or not) of the Final Judgment in this matter and, pursuant to that law, foreign country judgments may be, but are not required to be, enforced in Ohio under the doctrine of comity.

Lloyd's responds that numerous courts throughout the United States have applied the applicable state versions of the Uniform Foreign Country Money-Judgment Recognition Act in exercising diversity jurisdiction pursuant to the *Erie* Doctrine in Lloyd's actions seeking recognition of its judgments. ***See, e.g., Society of Lloyd's v. Turner***, 303 F.3d 325 (5th Cir. 2002)(affirming summary judgment for Lloyd's, under Uniform Foreign Country Money-Judgment Recognition Act, on grounds that English courts provide due process and enforcement of English judgment was not repugnant to Texas public policy); ***Society of Lloyd's v. Ashenden***, 233 F.3d 473 (7th Cir. 2000)(affirming summary judgment for Lloyd's under Illinois Uniform Foreign Money-Judgment Recognition Act, explaining that existence of due process in English courts is a "question ... not

---

[3] Nevertheless, Mrs. Shell acknowledges that because the Act was largely intended to codify the common law doctrine of comity with regard to foreign country money-judgments, its provisions may be examined vis-a-vis the doctrine of comity in Ohio. In any event, Mrs. Shell seeks summary judgment in this matter, in part, on Lloyd's alleged failure to meet the specific requirements of the Ohio Recognition Act.

open to doubt"); *Society of Lloyd's v. Mullin*, 255 F. Supp.2d 468 (E.D. Pa. 2003)(granting summary judgment and recognizing English Judgment applying Pennsylvania's Uniform Foreign Money Judgments Recognition Act), *aff'd*, 96 Fed. Appx. 100, 2004 W.L. 1012904 (3rd Cir. 2004)(unpublished).

The Court agrees with Lloyd's that the Ohio Recognition Act governs this matter. The foreign judgment recognition statute is a uniform act and not one reflecting different rules of different states. *Ashenden*, 233 F.3d at 476-77. The decisions cited by Mrs. Shell, however, pre-date the Ohio Recognition Act. A review of the decisions cited by Lloyd's applying the respective states' foreign judgment recognition statute persuades the Court that Ohio's Recognition Act supplies the substantive law of Ohio with respect to the recognition of foreign country money judgments in this case, and not the precursor common law cited by Mrs. Shell.

## IV. RECOGNITION OF THE ENGLISH FINAL JUDGMENT

Lloyd's asserts it meets all the requirements for this Court's recognition of the English Final Judgment. Section 2329.01(A) provides, in pertinent part, that a "foreign country judgment that is final, conclusive, and enforceable where rendered shall be recognized. . . ." Subsection (B) provides "a foreign country judgment is conclusive between the parties to the extent that it grants or denies the recovery of a sum of money." However, a foreign judgment will not be found "conclusive" where (1) the judgment was rendered under a system that does not

11

provide impartial tribunals or procedures that are compatible with the requirements of the due process of law; (2) the foreign court did not have personal jurisdiction over the defendant; or (3) the foreign court did not have jurisdiction over the subject matter. Ohio Rev. Code § 2329(B)(1), (2), (3).

In this case, it is undisputed that the Final Judgment is a "foreign country judgment" that is "final" and "conclusive" within the meaning of the Ohio Recognition Act.[4] There has been no assertion that the Final Judgment was rendered under a system that fails to provide for impartial tribunals or procedures compatible with the mandates of due process. Moreover, federal courts have found the English judiciary to constitute a "system" providing fair tribunals compatible with due process. *See Society of Lloyd's v. Turner*, 303 F.3d 325, 331 (5th Cir. 2002); *Society of Lloyd's v. Ashenden*, 233 F.3d 473, 476 (7th Cir. 2000). In addition, Mrs. Shell, through the General Undertaking, submitted her person to the jurisdiction of the English Court. Mrs. Shell recognized that any dispute with Lloyd's related to her participation in the Lloyd's market would be governed by English law and would be exclusively within the cognizance of the English courts. (Doc. 11, Demery Statement, ¶ 5; Exhibit 1). Thus, the exceptions to whether a judgment is "conclusive" within the meaning of the Recognition Act do not apply here.

---

[4] The Court notes that Jonathan Hirst, Q.C., the English barrister retained by Mrs. Shell, agrees with Mr. Demery's opinion that the English judgment obtained by Lloyd's against Mrs. Shell is "final" and "conclusive." (Doc. 37, Exh. A, Statement of Opinion of Jonathan William Hirst, Q.C., ¶8).

Mrs. Shell nevertheless contends the Court should not recognize the English judgment for two reasons. First, she contends that Lloyd's commenced this action more than six years after entry of the English judgment and, as a result, the English judgment was not as of the March 2004 filing date of this federal action "enforceable where rendered" under the Ohio Recognition Act. Second, she argues that because she did not receive actual notice of the English Court's proceedings, this Court cannot enforce the English court's judgment against her.

**A. Is the English judgment against Mrs. Shell "enforceable where rendered" under the Ohio Recognition Act?**

Mrs. Shell argues that the Ohio Recognition Act requires a foreign country judgment to be "enforceable where rendered" as a condition precedent to being recognized and enforced. Ohio Rev. Code § 2329.91(A) states that a "foreign country judgment that is final, conclusive, and *enforceable where rendered* shall be recognized. . . ." (Emphasis added). Mrs. Shell argues that her English judgment ceased to be "enforceable" in England six years after it was rendered (June 2003), some eight months prior to commencement of this federal court action.

13

In support of her claim, Mrs. Shell presents the declaration of Jonathan Hirst, Q.C., an English barrister.  Mr. Hirst states that the English judgment is no longer enforceable "by action" in England.  Based on Section 24 of the Limitation Act of 1980 providing a six year time limit for bringing an action to enforce a judgment and English case law, Mr. Hirst opines:

> 13. The judgment against Mrs Shell became immediately effective and enforceable when it was entered on 30 June 1997. By 8 March 2004, the date of commencement of the proceedings in Ohio, the six year limitation period for enforcement of the judgment by action had expired without any proceedings being taken to enforce the judgment by action. Had Lloyd's commenced these proceedings in time, the effect would have been, really as a matter of right, to produce a fresh judgment enforceable for another six years. But they did not, and it is now too late to commence proceedings to enforce the judgment by action. Such proceedings are time barred.

(Doc. 37, Exh. A, Statement of Opinion of Jonathan William Hirst, Q.C., ¶13).  Mr. Hirst further opines that after six years an English judgment cannot be "enforced by writ of execution" without the judgment creditor having obtained specific leave of court upon application.  RSC Order 46 rule 2(1)(a)–still part of the Civil Procedure Rules (CPR), the new code of procedure applicable in all civil courts–provides in pertinent part: "A writ of execution to enforce a judgment or order may not issue without the permission of the court . . . where 6 years or more have elapsed since the date of the judgment or order." (Doc. 37, Exh. 2, tab 6). Under the specific circumstances of this case which are outlined by Mr. Hirst in his Statement, he would "expect any application by Lloyd's for permission to issue a writ of execution to fail." (Doc. 37, Exh. A, Hirst Statement, ¶¶14–27).  With regard

to the procedures of Charging Orders and Third Party Debt Orders, Hirst avers that these are discretionary remedies that the Court may grant or refuse as the circumstances warrant.  Hirst states that a Charging Order could not be made against Mrs. Shell unless she had land in England or Wales, or held other specific types of property interests (stocks, monies, beneficial trusts) subject to a Charging Order.  Hirst also indicates that a Third Party Debt Order could not be made unless Mrs. Shell was owed money by a debtor who is within England and Wales. (Doc. 37, Exh. A, Hirst Statement, ¶¶37, 40).  Mrs. Shell argues that if the English judgment cannot be enforced by action and cannot be enforced by execution, it does not meet the "enforceable where rendered" requirement of Ohio Rev. Code § 2329.91(A) and that she is entitled to summary judgment as a matter of law.

Lloyd's appears to concede that a fresh action to enforce an English judgment cannot be timely brought in England after the elapse of six years. (Doc. 45 at 7).  However, Lloyd's argues that the English judgment does not fall short of being "enforceable" under Section 2329.91(A) because it remains susceptible of enforcement through any of several judgment collection mechanisms provided by English law notwithstanding the passage of the six year limitation mark.  Lloyd's contends that "enforcement of an English judgment in England outside the six-year period is feasible, at least with leave of court, by writs of execution, charging orders, and third party debt orders (or garnishee orders)." (Doc. 45 at 7).  The Hirst Statement describes these three mechanisms in Paragraphs 13 through 39.

15

Lloyd's also points out that Hirst abstains from flatly averring that the Final Judgment is not unenforceable. (Doc. 37, Exh. A, Hirst Statement, ¶27(6)). Demery states that "the Final Judgment is not enforceable in so many ways or so easily today in England as it was prior to the sixth anniversary of its entry by the English Court, but it would be simply incorrect to say that the final Judgment is unenforceable in England." (Doc. 45, App. B, Demery Second Supplemental Statement, ¶ 8).

Mrs. Shell counters that considering six years have expired since the entry of the English judgment against her and because Lloyd's has neither sought nor obtained permission of the English court for issuance of a writ of execution which it must do after six years, the judgment was not enforceable by execution in England at the time this action was commenced in federal court in March 2004. Mrs. Shell argues that Lloyd's is unable to use the judicial power of England to execute on its judgment after six years unless and until it applies and obtains permission upon showing of an adequate excuse for delay. Therefore, she argues, the judgment is not "enforceable" in England, not "enforceable where rendered" for purposes of the Ohio Recognition Act, and hence cannot be recognized in this Court.

16

The issue before this Court, therefore, is whether, in light of the expiration of six years from the date of the judgment, Lloyd's must apply and obtain leave of the English court to issue a writ of execution under RSC Order 46 before this Court can find the judgment is "enforceable where rendered," or whether the mere existence of judgment collection mechanisms that are capable of being utilized by Lloyd's means the English judgment against Mrs. Shell is "enforceable where rendered" under the Ohio Recognition Act. The issue of whether, as a matter of English law, the English Judgment is currently enforceable is a question of law for the Court. *See* Fed. R. Civ. P. 44.1; *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996). But the construction of the term in the Ohio statute "enforceable where rendered" is a question of state law.

There are no Ohio cases construing the term "enforceable where rendered" as set forth in the Ohio Recognition Act. However, the parties cite to two state court decisions which touch on the issues involved in this case. In *Overseas Development Bank in Liquidation v. Nothmann*, 103 A.D.2d 534, 480 N.Y.S.2d 735 (2d Dept. 1984), *order rev'd*, 64 N.Y.2d 927, 488 N.Y.S.2d 632, 477 N.E.2d 1086 (1985), the court addressed a similar issue under the New York version of the Uniform Foreign Country Money–Judgments Recognition Act. The New York Recognition Act, like Ohio's, applies to any foreign country judgment which is "final, conclusive and enforceable where rendered. . . ." *Id.* at 539, 480 N.Y.S.2d at 738. The judgment creditors in *Nothmann* brought an action in a New York

17

state court to enforce two English money judgments more than six years after the date the judgments became enforceable in England. The parties in *Nothmann* agreed that the English Limitations Act of 1980 barred an action to enforce the judgments in England since six years had elapsed since the date the judgments became enforceable. Notwithstanding the expiration of six years, there was also general agreement that the judgments in question were capable of enforcement by writ of execution. Under Order 46 of the Rules of the Supreme Court, "a writ of execution to enforce a judgment or order may not issue without leave of Court [inter alia] where six years or more have elapsed since the date of the judgment or order." *Id.* The New York court held that "absent a determination by the English courts pursuant to Order 46 granting plaintiff leave to issue a writ of execution, the judgments in question were not enforceable in England at the time of the commencement of the instant proceedings within the meaning of [the Recognition Act] . . . ." 103 A.D.2d 534, 544, 480 N.Y.S.2d 735, 741. The court reasoned:

> [P]laintiff, whether justifiably or not, permitted its judgments to become stale under English law by failing to execute thereunder within six years. In order to recover on the judgments under English law, it was necessary for plaintiff to revive its right of enforcement through the procedures outlined in Order 46. It was required under Order 46 that an application for leave to issue a writ be made to the English court--an application directed to the sound discretion of that court (W.T. Lamb & Sons v. Rider, 2 KB 331). While the arguments made by plaintiff that, notwithstanding the delay in seeking enforcement, it should be permitted to enforce the judgments may well be persuasive, those arguments are properly addressed to the English courts and not to the New York courts. It is by no means a foregone conclusion that if the application for leave to issue the writ of execution were made in England, it would be granted. It remains

> within the English court's discretion under English law to deny the application and thus preclude enforcement of the judgments (W.T. Lamb & Sons v. Rider, supra). Regardless of the outcome, however, the question remains one to be addressed to the discretion of the English court which rendered the judgments. It is not this court's function under [the Recognition Act] to substitute our judgment for that of the courts of England. Not until there has been a determination by the courts of England that notwithstanding the passage of the six-year period, plaintiff should be granted leave to execute upon its judgments, can the courts of New York enforce the judgments.

103 A.D.2d at 543-44, 480 N.Y.S.2d at 741. The New York court therefore concluded that the judgments in question were not "enforceable where rendered" under the New York Recognition Act. While an appeal from the lower court's decision was pending, the judgment creditor proceeded to seek and was granted permission by the English court to issue a writ of execution. As a result, the New York Court of Appeals, recognizing that the basis for the lower court's decision no longer applied and "[w]ithout passing on the reasoning of the court below," reversed and remanded the case for consideration of the judgment debtor's other arguments for denying recognition of the foreign judgment. 64 N.Y.2d 927, 928, 477 N.E.2d 1086, 1987.

In *Tonga Air Services, Ltd. v. Fowler*, 118 Wash.2d 718, 826 P.2d 204 (1992), the Supreme Court of Washington reviewed the same six-year limitations period and court rules involving the execution of English judgments involved in *Nothmann* and the instant case. The creditor in *Fowler* requested and was granted permission by the Tongan court (applying English law) to issue a writ of execution

some eight years after the judgment had been rendered.  The debtor argued that the Tongan court abused its discretion in granting leave to issue execution on the Tongan judgment and therefore the Washington court should not recognize the Tongan judgment.  The Washington Supreme Court found no abuse of discretion on the part of the Tongan court citing the following factors.  The judgment debtor: left Tonga shortly after the judgment was entered; left no assets behind; returned to the State of Washington some 10,000 miles across the ocean; failed to answer at least eight letters sent by the judgment creditor to his last known address; and would not suffer any prejudice by reason of delay in execution. *Id.* at 735, 826 P.2d at 213.

While not directly on point, both the *Nothmann* and *Fowler* courts recognized that where a judgment creditor, after the expiration of the six year time limit, actually applies and is granted leave to issue a writ of execution by an English court, the English judgment may be "enforceable where rendered" in the absence of other grounds for non-recognition of the foreign judgment.

20

Lloyd's argues that the factors justifying leave to issue a writ of execution in *Fowler* are analogous to those in the instant case and promote recognition in the instant case.[5] Lloyd's points out that the only difference between *Fowler* and the present case is that the judgment debtor in *Fowler* actually obtained the foreign court's leave to execute on the judgment after the expiration of six years. Lloyd's further argues that requiring this Court to delve into the likelihood of success of any particular foreign country enforcement mechanism does not square with the purpose of the Uniform Foreign Money–Judgments Recognition Act which was intended to "make it more likely that judgments rendered in the state will be recognized abroad" by codification of state rules on the recognition of money–judgments rendered in a foreign court. *Kam–Tech Systems Ltd. v. Yardeni*, 340 N.J. Super. 414, 421, 774 A.2d 644, 647–48 (2001). Lloyd's argues that this Court should not weigh and counterbalance the available enforcement techniques of a foreign country for to do so would counteract the intent of the Recognition Act to provide a ready mechanism for recognizing foreign judgments. Lloyd's contends the issue is not *how* "enforceable where rendered" the English judgment is, but whether the judgment is "enforceable" by some means possible and whether

---

[5]     These factors include: (a) Lloyd's in fact endeavored to make contact with Shell after issuance of the Final Judgment—*see* Doc. 11, Demery Statement, ¶ 13, Exhibit 6; (b) Lloyd's correspondence was returned as undeliverable—*see* Doc. 11, Demery Statement, ¶ 13; Doc. 45, Demery Second Supplemental Statement, ¶ 7; (c) Shell ceased receiving (or accepting) mail delivered to the address that she had supplied to Lloyd's—*see* Doc. 6, Shell Declaration, ¶¶ 8, 15-16; and (d) Shell—despite knowing she was obligated to Lloyd's, becoming aware of the English Action, and enjoying the benefit of counsel in both Ohio and England, never let Lloyd's know where she could be reached or otherwise communicated with Lloyd's prior to 2004—*see* Doc. 6, Shell Declaration ¶¶ 11-12; Exhibit A.

21

Lloyd's would have a chance to collect on the Final Judgment in England. (Doc. 44 at 16).  Lloyd's further contends that while there are mechanisms for enforcement under English law, "no purpose is or would have been served by having Execution Orders [the term Demery uses to describe Writs of Execution, Charging Orders and Garnishee Orders] issued, or indeed taking any enforcement action, as Mrs. Shell, to Lloyd's knowledge, neither has nor had any assets in England against which such Enforcement Orders or other enforcement action could be effective." (Doc. 45, App. B, Demery Second Supplemental Statement, ¶ 7).       It is understandable why Lloyd's may have been reluctant to apply to the English court for issuance of a writ execution against Mrs. Shell in the absence of assets in England. Nevertheless, the Court disagrees that "no purpose" would be served by Lloyd's application to the English court for Execution Orders.  The *Nothmann* and *Fowler* decisions, as well as the cases cited by Mr. Hirst at Doc. 37, Exh. A, Hirst Statement¶¶19-26, suggest that a separate consideration comes into play when the six-year period for automatic enforcement has expired.  In such an instance, the onus is on the judgment debtor to show a sufficient justification for the delay in executing on the judgment and to show that the circumstances warrant the issuance of a writ of execution, Charging Orders, or Third Party Debt Orders outside of the six year time period.  The decision to grant or deny permission is a matter left to the "sound discretion" of the court, *Nothmann*, 103 A.D.2d at 543-44, 480 N.Y.S.2d at 741, **citing** *W.T. Lamb & Sons v. Rider*, 2 KB 331, and the

question becomes, whose discretion: the court of England or this Court?  The Washington and New York decisions cited above suggest that the discretion should be exercised by the English court in the first instance, and where permission is granted, the judgment becomes "enforceable" and the court sitting in the United States can then recognize the judgment.  While Lloyd's posits several good reasons why in fact a court may find that execution after six years is appropriate under the circumstances of this case, this Court agrees with the New York court in *Nothmann* that the English courts should be the first to decide whether the reasons advanced in fact justify execution outside of the six year time limit.  The Court believes that Lloyd's should be required to apply and obtain the permission of the English court through existing procedures of English law before this court can find that the English judgment against Mrs. Shell is "enforceable where rendered" within the meaning of the Ohio Recognition Act.  Because Lloyd's has not done so, the English judgment cannot be found to be "enforceable where rendered" under the Ohio Recognition Act.  Accordingly, summary judgment for Mrs. Shell should be granted.[6]

---

[6]     In view of the Court's recommendation, the Court need not reach Mrs. Shell's arguments that enforcement and recognition of the English default judgment is premature in that no discovery on her defenses has yet been commenced. (Doc. 39 at 3-8).

23

**B. Is "actual notice" required before the Court may recognize the English judgment?**

Although the Court recommends that summary judgment be granted for Mrs. Shell for the reasons stated above, the Court will address Mrs. Shell's alternative notice argument for purposes of completeness. Mrs. Shell contends that she did not receive actual notice of the English action against her and, as a result, the English judgment should not be recognized by this Court as a matter of comity. (Doc. 37 at 8). In this respect, Mrs. Shell seeks reconsideration of Chief Judge Beckwith's Order denying Mrs. Shell's previous motion to dismiss on the basis that Shell did not receive actual notice of the English lawsuit in which a default judgment was entered against her. (Doc. 16). In that Order, the Court construed the term "notice" as used in the Ohio Recognition Act, Ohio Rev. Code § 2329.92(A), which provides that a foreign judgment shall not be recognized in a court applying Ohio law if "[t]he defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend." Judge Beckwith noted that the term "notice" is not defined in the statute and case law on the subject is nonexistent. Mrs. Shell argued for an "actual" notice standard. Judge Beckwith rejected this construction, reasoning that actual notice to a defendant is not a prerequisite to the issuance of a default judgment under Ohio and federal law and the Court would not impose a requirement upon the English judgment that it would not impose in an action pending in this Court or in a court of Ohio. (Doc. 16 at 4). For the reasons stated by Judge Beckwith in her

decision, which the Court shall not repeat here, the undersigned agrees that actual notice is not a prerequisite to the establishment of personal jurisdiction for an entry of default judgment against Mrs. Shell.  The English courts have held that service on a Name through the Substitute Agent AUA9 constitutes valid, effective service. (Doc. 11, Demery Statement, ¶ 18, Exh. 9, *Society of Lloyd's v. Richard Tropp*).  Likewise, courts in this country have recognized that service though an appointed agent like AUA9 constitutes valid service and notice of the lawsuit on the defendant Name, regardless of whether the agent actually notified the Name of the English proceeding.  *See Society of Lloyd's v. Byrens*, Case No. 02cv449-J (S.D. Cal. May 29, 2003)(Doc. 44, App. B); *Society of Lloyd's v. Campbell-White*, Case No. 03-10950 (D. Mass. Aug. 23, 2004)(Doc. 44, App. D); *Society of Lloyd's v. Cohen*, Case No. 03-21022 (5th Cir. Aug. 5, 2004)(Doc. 44, App. C).  The Court agrees with rationales set forth in those cases and finds that service on Mrs. Shell through her agent AUA9 constitutes sufficient notice to Mrs. Shell for purposes of Section 2329.92(A) and recognition under the Ohio Recognition Act.

Mrs. Shell attempts, in part, to distinguish those cases by arguing that while the English court may have had personal jurisdiction over her through service on the AUA9, as a matter of comity (*i.e.*, an Ohio court's willingness to recognize a foreign court's judgment) this Court should require she be given actual notice to enable her to defend the English action before this Court can recognize any judgment.  She contends that if service on the AUA9 constitutes sufficient notice

to confer personal jurisdiction under Ohio Rev. Code § 2329.91(B)(2), then the "notice" set forth in § 2329.92(A) must necessarily, as a matter of statutory construction so as not to be redundant, mean something different, to wit, actual awareness of the proceeding and an opportunity to defend.  She argues that "the discretionary nature of the comity doctrine as articulated by every Ohio court that has addressed the issue of comity strongly suggests that a court in Ohio, including a federal court since it is acting under state law, should be cautious in exercising its discretion to enforce a foreign default judgment where the Ohio defendant did not even know a case had been filed against her in England." (Doc. 37 at 11).

Mrs. Shell concedes there are no known cases supporting her position in this regard. *Id.*  In view of the case law which supports the finding that service on the authorized agent AUA9 constitutes sufficient notice to the Names and the absence of any case law supporting Mrs. Shell's position, the Court is reluctant to impose the additional requirement of actual notice on a judgment debtor before a foreign judgment can be recognized under § 2329.92(A).  Given that service on a defendant's agent would constitute adequate notice in any original action commenced in this Court or a state trial court, the Court believes that requiring actual notice to a defendant when a foreign judgment is at issue would be contrary to the purposes underlying the Ohio Recognition Act which is intended to facilitate recognition of Ohio state judgments in foreign courts.  Accordingly, the Court declines to adopt Mrs. Shell's construction of the term "notice" as used in §

2329.92(A) to mean actual notice before the foreign judgment can be recognized. Thus, to the extent Mrs. Shell seeks summary judgment on this basis, her motion should be denied.

## IT IS THEREFORE RECOMMENDED THAT:

1. Plaintiff Lloyd's motion for summary judgment against Shell (Doc. 20) be DENIED.

2. Defendant Shell's cross-motion for summary judgment (Docs. 37) be GRANTED.

## CONCLUSION

Upon a *de novo* review of the record and after considering the parties' objections, the Court modifies the Report and Recommendation (doc. no. 52) as follows:

> a) at Doc. No. 52, page 8, line 7, delete "Section 2329.01(A);" insert "Section 2329.91(A)."
>
> b) at Doc. No. 52, page 16, line 19, delete "debtor;" insert "creditor."

The Court finds that parties' objections have either been adequately addressed and properly disposed of by the Judge or present no particularized arguments that warrant specific responses by this Court. The Court finds that the Magistrate Judge has accurately set forth the controlling principles of law and properly applied them to the particular facts of this case and agrees with the Judge.

27

Accordingly, the Court hereby **ADOPTS AS MODIFIED** the Report and Recommendation of the United States Magistrate Judge (doc. no. 52 ). Plaintiff's Motion for Summary Judgment against Shell (doc. no. 20) is **DENIED** and defendant Shell's Cross–Motion for Summary Judgment (doc. no. 37) is **GRANTED**.

This case is **DISMISSED AND TERMINATED** on the docket of this Court at plaintiff's cost.

**IT IS SO ORDERED.**


_____s/Herman J. Weber_____
Herman J. Weber, Senior Judge
United States District Court